RECEIPT # 53939
AMOUNT $ 150
SUMMONS ISSUED  Y
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK._____
DATE_____2/17/04___

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD KASSOVER, on behalf of the Ronald Kassover IRA and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SONUS NETWORKS, INC., HASSAN M. AHMED, and STEPHEN J. NILL,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW**<br><br>**JURY TRIAL DEMANDED** |

04  DPW

MAGISTRATE JUDGE Bowler

Plaintiff, on behalf of the Ronald Kassover Individual Retirement Account ("IRA") and of all other persons similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters based upon the investigation made by and through his attorneys, which investigation included, among other things, a review of the public documents and news releases of Sonus Networks, Inc., including its press releases and public filings with the U.S. Securities and Exchange Commission (the "SEC").

## NATURE OF THE ACTION

1. Plaintiff brings this action as a class action on behalf of the Ronald Kassover IRA and all other persons who purchased the common stock of Sonus Networks, Inc. ("Sonus" or the "Company") during the period June 3, 2003 through and including February 11, 2004 (the "Class Period"), to recover damages caused by defendants' violation of the federal securities laws.

2.      Sonus purports to be a leading provider of packet voice infrastructure solutions for wireline and wireless service providers. The Company's products include media gateways, softswitches and network management systems, which are deployed in service provider networks worldwide.

3.      Throughout the Class Period, Sonus touted its strong financial performance and consecutive quarter-over-quarter revenue growth to the unsuspecting public. In reality, however, the Company's revenues and certain other financial statement accounts were misstated as a direct result of the Company's improper revenue recognition and certain other improper practices.

4.      On January 20, 2004, after the market closed, Sonus stunned the public when the Company issued a press release announcing that it would delay the release of its fourth quarter and year-end financial results for the fiscal year-ended December 31, 2003 because the Company needed more time to complete its year-end audit. The following day, the stock price declined $.98 per share, or 9.9%, to close at $8.93.

5.      Then, on February 11, 2004, after the market closed, Sonus further shocked investors when the Company issued a press release announcing a so-called "update" on the status of its fourth quarter and year-end 2003 financial results. As Bill Mann, an analyst for Motley Fool.com described, "[t]his isn't some 'reaffirming guidance' kind of communiqué – it was a bombshell."

6.      Indeed, the Company announced that, in connection with the year-end audit, its auditors had uncovered certain improper revenue recognition practices and other issues relating to both the timing of revenue recognized and other financial statement accounts. The Company further revealed that as a result of these improper practices, it

may have to restate at least its 2003 financial statements and possibly prior periods as well. The Company tried to soften the blow by reassuring investors that certain employees responsible for the improper conduct had been terminated.

7. Upon the wake of this announcement, Sonus' common stock dropped $1.05, or 15% in extended trading that day. The following day, the stock continued to plummet, closing at $5.39 per share, down $1.30 per share, or 19.4% from the previous day's close. In total, the stock price has declined an astounding $2.11, or 28% since the February 11, 2004 Announcement, on volume of ninety-six million shares, nearly fifteen times that of the three-month average volume.

8. Since the Company announced the delay of its fourth quarter and year-end 2003 earnings on January 20, 2004, it has shed 46% of its market capitalization, or $1.2 billion and its shares have fallen nearly 50%.

9. Wall Street analysts were outraged by the Company's disclosure of its improper accounting practices. Goldman Sachs, Smith Barney and Legg Mason all downgraded the Company's rating within a day of the February 11, 2004 Announcement, citing the potential restatement as the primary reason. In addition, Bill Mann, an analyst for Motley Fool.com, commented "[f]or management to have missed such activity for an extended period of time is inexcusable. So while it may be great that it has identified and eliminated wrongdoers, this sounds like a much deeper problem."

## JURISDICTION AND VENUE

10. The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

11. The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the dissemination to the investing public of the misleading statements and omissions at issue, occurred in substantial part in this District. Moreover, Defendants conduct substantial business in this District.

13. In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

**PARTIES**

14. Plaintiff Ronald Kassover purchased Sonus common stock through his IRA during the Class Period as set forth on the attached certification and was damaged thereby.

15. Defendant Sonus Networks, Inc. is a leading provider of packet voice infrastructure products and maintains its principal executive offices at 5 Carlisle Road, Westford, Massachusetts 01886.

16. Defendant Hassan M. Ahmed ("Ahmed") served as Sonus' President and Chief Executive Officer at all relevant times. Defendant Ahmed made statements to investors in and approved Sonus' materially false and misleading press releases. Defendant Ahmed also signed the Company's quarterly reports on Form 10-Q filed with the SEC during the Class Period.

17. Defendant Stephen J. Nill ("Nill") served as Sonus' Chief Financial Officer, Vice President of Finance and Administration and Treasurer at all relevant times. Defendant Nill approved Sonus' materially false and misleading press releases and signed the quarterly reports on Form 10-Q filed with the SEC during the Class Period.

18. Defendants Ahmed and Nill are sometimes referred to herein as the Individual Defendants.

19. By reason of their positions with the Company, the Individual Defendants had access to internal documents, reports and other information, including adverse non-public information concerning the Company's business and financial condition, and attended management and/or board of director meetings. As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

20. Sonus and the Individual Defendants, as officers and directors of a publicly held company, had a duty to promptly disseminate truthful and accurate information with respect to and to promptly correct any public statements issued by or on behalf of the Company that had become false and misleading.

21. Each defendant knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's common stock and would cause the price of the Company's common stock to become artificially inflated. Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

22. Defendants are liable, jointly and severally, as direct participants in and co-conspirators of the wrongs complained of herein.

## CLASS ACTION ALLEGATIONS

23. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased the common stock of Sonus during the period June 3, 2003 through and including February 11, 2004, and who suffered damages thereby. Excluded are the defendants, members of the defendants' families, any entity in which any defendant has a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the defendants (the "Class").

24. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to the plaintiff at this time and can only be ascertained through appropriate discovery, the plaintiff believes there are, at a minimum, hundreds of members of the Class who traded during the Class Period. Sonus had 244,451,558 shares of its common stock outstanding as of September 30, 2003. Throughout the Class Period, Sonus' common stock actively traded on the NASDAQ under the ticker symbol "SONS."

25. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether the Company issued false and misleading statements during the Class Period;

(c) whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period;

(d) whether defendants acted knowingly or recklessly in issuing false and misleading statements;

(e) whether the market prices of Sonus' securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

26. Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

27. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

28. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

29.     Sonus was founded in 1997. The Company's products are a new generation of carrier-class switching equipment and software that enables voice services to be delivered over packet-based networks. These packet-based networks transport traffic in small bundles ("packets"), thereby creating a more efficient and cost-effective means of providing communications services. By enabling voice traffic to be carried over packed-based networks, the Company's products will accelerate the convergence of voice and data into the new public network.

30.     Sonus' primary customers are communications service providers, including long distance carriers, local exchange carriers, Internet service providers, wireless operators, cable operators, international telephone companies and carriers that provide services to other carriers.

31.     Sonus sells its products primarily through direct sales forces. In some markets, however, the Company may also sell its products through distributors and resellers.

### B.     Pre-Class Period Statements

32.     On April 9, 2003, after the market closed, the Company issued a press release announcing Sonus' financial results for the first quarter ended Mach 31, 2003 (the "April 9th Press Release"), explicitly stating that its financial statements were prepared "in accordance with U.S. generally accepted accounting principles (GAAP)."

Specifically, the Company reported total revenue for the quarter of $16.0 million and a net loss and loss per share of $4.4 million and $0.02 per share, respectively. In the April 9th Press Release, Defendant Ahmed boasted:

> Our financial results for the first quarter reflected good progress toward our business objectives. We grew our revenues 27 percent over last quarter, and by continuing to manage our business with precision, we further narrowed our net loss. In Q1, we also continued to add new customers around the globe and made important additions to our product family.

33. As a result of Sonus' positive statements contained in the April 9th Press Release, Sonus' common stock rose from a closing price on April 9, 2003 of $2.20 to close at $2.72 on April 10, 2003, an increase of $0.52, or 23.6%.

34. On April 22, 2003, the Company issued a press release announcing that it had completed a public offering of twenty million shares of its common stock at a per share price of $3.05, made under an effective registration statement filed with the SEC. Defendant Ahmed was quoted as saying:

> Enhancing our financial strength has been an important component of our strategy as we seek to expand our partnerships with some of the world's largest service providers. The financial transaction announced today bolsters our balance sheet, and positions us to build on our success in providing the next-generation, carrier-class solutions that enable voice services to be delivered over packet-based networks.

35. On May 9, 2003, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2003 (the "First Quarter 10-Q"). The First Quarter 10-Q repeated the same materially false and misleading financial information contained in the April 9th Press Release. In addition, the defendants represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the

9

regulations of the Securities and Exchange Commission (SEC) and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.

\* \* \*

*(e) Revenue Recognition*

Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

Defendants Ahmed and Nill signed the First Quarter 10-Q.

36.     The Class Period begins on June 3, 2003 when the price of Sonus shares closed at $5.11 per share.

## C.     Materially False And Misleading Statements Disseminated During The Class Period

37.     On July 10, 2003, after market close, the Company issued a press release announcing Sonus' financial results for the second quarter and six months ended June 30, 2003 (the "July 10th Press Release") explicitly stating that its financial statements were prepared "in accordance with U.S. generally accepted accounting principles (GAAP)." Specifically, the Company reported total revenue for the second quarter and six months of $21.4 million and $37.4 million, respectively, a net loss of $3.2 million and $7.6 million, respectively, and a loss per share of $0.01 and $0.04 per share, respectively, for the same period. In addition, Defendant Ahmed highlighted the Company's quarter-over-quarter revenue growth, stating:

> We are pleased with the progress that we made in the second quarter, particularly with our 33% sequential revenue growth. We executed across all areas of the business broadening and strengthening our customer base, expanding our leading product offering, bolstering our balance sheet and advancing our drive to profitability.
>
> \* \* \*
>
> Our revenue growth, coupled with premier customer wins like Verizon Communications underscores our belief that the packet voice market is entering a new phase. Incumbent carriers are now adopting packet voice solutions and Sonus Networks is proud to be at the forefront of this transition.

38. As a result of Sonus' positive statements contained in the July 10th Press Release, Sonus' common stock soared from a closing price on July 10, 2003 of $5.72 to close at $7.10 on July 11, 2003, an increase of $1.38, or 24.1%.

39. On August 14, 2003, Sonus filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2003 (the "Second Quarter 10Q"). The Second Quarter 10-Q repeated the same materially false and misleading financial information contained in the July 10th Press Release. In addition, the defendants represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC), and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.
>
> \* \* \*
>
> *(e) Revenue Recognition*
> Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue

11

from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

Defendants Ahmed and Nill signed the Second Quarter 10-Q.

40. On September 23, 2003, the Company issued a press release announcing that it had completed a public offering of seventeen million shares of its common stock at a per share price of $7.75 less underwriter discounts, made under an effective registration statement filed with the SEC. Defendant Ahmed was quoted as saying:

> Strengthening our balance sheet has been an important objective for Sonus as we continue to develop relationships with some of the world's largest service providers. The financial transaction announced today enhances our position as we enter the next phase of the migration from circuit to packet voice networks.

41. On October 8, 2003, after the close of the market, the Company issued a press release announcing Sonus' financial results for the third quarter and nine months ended September 30, 2003 (the "October 8th Press Release") explicitly stating that its financial statements were prepared "in accordance with U.S. generally accepted accounting principles (GAAP)." Specifically, the Company reported total revenue for the third quarter and nine months of $28.6 million and $66.0 million, respectively. The Company also reported net income of $1.2 million and earnings per diluted share of $0.01 for the third quarter and a net loss and loss per diluted share of $6.4 million and $0.03, respectively, for the nine months. In the October 8th Press Release, defendant Ahmed commended the Company for attaining four quarters of consecutive growth:

> This was a strong quarter for Sonus Networks, our fourth consecutive quarter of revenue growth. Our revenues grew 34% sequentially to $28.6 million, reflecting increased market demand for packet telephony and the expanding number of customers who have adopted Sonus' solutions. We achieved an important milestone in reporting our first quarterly profit on a GAAP basis. Additionally, we bolstered our balance sheet to capitalize on the opportunity ahead, adding

$126 million to our cash and marketable securities through a common stock offering in September.

42.     As a result of Sonus' positive statements contained in the October 8th Press Release, Sonus' common stock rose from a closing price on October 8, 2003 of $8.30 to close at $8.80 on October 9, 2003, an increase of $0.50, or 6%.

43.     On November 10, 2003, Sonus filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2003 (the "Third Quarter 10Q"). The Third Quarter 10-Q repeated the same materially false and misleading financial information contained in the October 8th Press Release. In addition, the defendants represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC), and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.
>
> *       *       *
>
> ***(d) Revenue Recognition***
> Sonus recognizes revenues from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenues when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenues are recognized as the services are provided. Revenues from maintenance and support arrangements are recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenues. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

Defendants Ahmed and Nill signed the Third Quarter 10-Q.

44. During the Class Period, defendants mislead the investing public and artificially inflated the price of Sonus' common stock by publicly issuing materially false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. The statements identified in ¶¶ 37 through 43 above were each materially false and misleading when made because:

    (a) Defendants knowingly or recklessly artificially inflated the Company's revenues, net income/(loss) and earnings/(loss) per share by causing revenue to be recognized in violation of SOP 97-2 and Company policy;

    (b) Defendants knowingly or recklessly artificially inflated the Company's accounts receivable and total assets by recording revenue before it was earned;

    (c) Defendants knowingly or reckless understated the Company's deferred revenue and total liabilities by recording unearned revenue as earned;

    (d) The Company's financial statements were not prepared in accordance with GAAP and the Company's financial statements were not fair statements of results for the interim periods presented; and

    (e) Defendants knowingly or recklessly violated the Company's own internal revenue recognition policy.

## D. The Truth Begins To Emerge

45. On January 20, 2004, Sonus shocked investors when the Company announced that it would delay the release of fourth quarter and year-end financial results for the fiscal year-ended December 31, 2003, pending completion of the 2003 audit.

46. Then, on February 11, 2004, after the market closed, Sonus further stunned investors when it announced that an internal review in connection with the Company's year-end audit identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts.

47. The Company further disclosed that it was currently reassessing the proper periods in which revenue should be recognized for those transactions and that revenue or deferred revenue in periods previously reported could be affected as a result of this "reassessment." Meanwhile, the Company tried to reassure investors that the responsible employees had been terminated.

48. Defendant Ahmed commented on the revelation:

We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting,

49. The Company's stock plunged $2.11 per share, or 28% the day after this shocking revelation, to close at $5.39 per share, on trading volume nearly fifteen times that of the three-month average.

50. In response to the Company's February 11th Announcement, several analysts downgraded the Company's rating. Among those analysts was Goldman Sachs, who downgraded the Company to "underperform," stating that "the uncertainty around the audit outweighs the health of the business." Similarly, both Smith Barney and Legg Mason cut Sonus' rating from "buy" to "hold."